DONALDSON ET AL v. STATE OF INDIANA, EX REL.
HONAN, ATTORNEY-GENERAL.

[No. 22,164. Filed April 13, 1913. Rehearing denied
January 19, 1915.]

1. ALIENS.—*Evidence.*—In an action to recover, as escheated property, the lands of an alleged alien who died abroad, evidence showing that, though decedent resided in the United States from 1860 to 1897, he never became a citizen, that he frequently went abroad for short visits, that, although when starting on his last trip he announced that he was going on a visit and took with him but a small amount of baggage, and had previously expressed a desire to be buried in the United States, he made no attempt to return, and that thereafter while abroad he made his will in conformity to the law of his native land in which he described himself as a former merchant of that country, was, in view of all the provisions of the will, and of the fact that he was an old man, in the land of his birth, etc., sufficient to overcome the presumption of a continuance of his residence in the United States and to support a finding that he was a *bona fide* resident of the land in which he died and was subject to the sovereign of that country. p. 619.

2. APPEAL.—*Evidence.*—*Findings.*—*Review.*—The weight of the evidence is for the trial court, and its finding that an alleged alien was not a resident of the United States at the time of his death will not be disturbed on appeal, where the facts and circumstances were such that the court can not say that there was no evidence to support it. p. 623.

3. ALIENS.—*Common-Law Rights.*—*Real Property.*—At common law an alien had capacity, by deed or other act of purchase, to take, hold and convey real estate against all except the State, and even against the latter until it might obtain a judgment by inquest of office, or office found, or equivalent; but he could not take, pass or transmit title to realty by descent, and if he died intestate his land immediately vested in the State by escheat. p. 625.

4. ALIENS.—*Rights in Real Property.*—*Laws Controlling.*—The capacity of an alien to transmit and take title to immovable property by devise or descent is a creature of the law of the state where such property may be situated. p. 626.

5. ALIENS.—*Real Property.*—*Transmission by Descent.*—*Power.*—*Statutes.*—The act of 1861 (Acts 1861 p. 153, §3936 Burns 1914), which was in force at the time an alien, through whom defendants claimed title by descent, acquired title to the lands in suit,

even if conceded to be in force and controlling as to the power of disposition at the time of his death in 1898, conferred capacity to transmit by descent on such aliens only who at the time the descent was cast were *bona fide* residents of the United States, and gave no support to defendants' claim of title, where it was found that the alien through whom they claimed was at the time of his death a *bona fide* resident of the land of his birth.  pp. 628, 629.

6. DESCENT AND DISTRIBUTION.—*Power to Transmit by Descent.— Power of Inheritance.*—The power to transmit by descent, as well as the power to take by inheritance, are mere rights in expectancy that do not vest until the death of the intestate.  p. 628.

7. ALIENS.—*Real Property.—Transmission by Descent.—Power.— Statutes.*—The act of 1881 (§2967 R. S. 1881, §4010 Burns 1914), relating to the rights of aliens to hold and dispose of real estate, though conferring on nonresident aliens the capacity to acquire, hold and enjoy real estate, and to convey, devise, mortgage or otherwise incumber it, included no provision for conferring capacity on such aliens to transmit by descent, and, since in the absence of statutory provision therefor the power to transmit property by descent does not exist, that act, if in force, would not support a claim of title by descent from an alien who was not a resident of the United States at the time of his death. p. 629.

8. ESCHEAT.—*Escheated Lands.—Title.—Disposition.*—Under the Constitution, Art. 8, §2, providing that the common-school fund shall consist, among other things, of "all lands and other estates which shall escheat to the State", §3 prohibiting the diminution of the common-school fund, §8 relating to education and providing that all trust funds held by the State shall remain inviolate and be exclusively applied to the purposes for which the trust was created, and §§3003, 3004 Burns 1914, §2477 R. S. 1881, Acts 1883 p. 98, relating to escheated estates and providing for their sale by boards of county commissioners, the lands of a nonresident alien who dies intestate vest in the State, until a sale thereof, in trust for the benefit of the common-school fund. p. 632.

9. STATUTES.—*Local or Special Law.—Disposition of Escheated Estates.—Validity.*—The act of 1903 (Acts 1903 p. 152), providing that escheated lands in the counties of Monroe and Lawrence shall not be sold and that the control and management thereof shall be vested in the trustees of Indiana University, is invalid as in violation of Art. 4, §22 of the Constitution forbidding the enactment of local or special laws in providing for the support of common schools and for the preservation of school funds. p. 633.

10. ESCHEAT.—*Cross-Complaint.—Demurrer to Answer.*—In an action by the State to recover, as escheated property, lands left by a deceased nonresident alien, a defendant asserting title in himself by way of cross-complaint must recover, if at all, upon the strength of his own title, and not on the weakness of his adversaries; hence, where such pleading was insufficient to show title in cross-complainant, there was no error in overruling a demurrer to the answer thereto which was also insufficient.   p. 634.

11. ESCHEAT.—*Action to Recover Escheated Lands.—Complaint. —Demurrer.*—The court did not err in overruling demurrers to the complaint in an action by the State for the recovery of lands in Lawrence County as escheated property, on the theory that under the act of 1903 (Acts 1903 p. 152), prohibiting the sale of escheated lands in Lawrence and Monroe counties and vesting the control and management of such lands in Indiana University, the university and not the State was the real party in interest, since that act was unconstitutional.   p. 634.

From Lawrence Circuit Court; *Robert N. Palmer*, Special Judge.

Action by the State of Indiana, on the relation of Thomas M. Honan, Attorney-General, against James Donaldson and others. From a judgment for relator, certain defendants appeal. *Modified and affirmed.*

*Baker & Daniels, Martin & Pearson* and *Whitcomb, Dowden & Stout,* for appellants.

*Thomas M. Honan,* Attorney-General, *Miers & Corr, Thomas H. Branaman* and *James E. McCullough,* for appellee.

MORRIS, J.—The State, on the relation of its Attorney-General, in 1900, instituted this action against divers persons, including those of the appellants who were next of kin to one George Donaldson, deceased. The purpose was to recover certain Lawrence County real estate, as escheated property. The case was in this court once before. *Donaldson v. State, ex rel.* (1906), 167 Ind. 553, 78 N. E. 182.

Appellants assign here, as errors, among other things, the overruling of demurrers to various paragraphs of complaint, and the court's conclusions of law on the facts specially

found. The following facts appear in the finding: George Donaldson was born in Scotland in 1811, and died there on September 17, 1898. During his entire life he was a subject of the Sovereign of the United Kingdom of Great Britain and Ireland, and never declared his intention to become a citizen of the United States. In 1860, or 1861, he came to the United States, and, from that time, to the year 1897, he was continuously a *bona fide* resident of this country. From 1865 to 1883, he was a *bona fide* resident of Lawrence County, and between September, 1865, and August, 1876, he became the owner, in fee simple, by deeds, of the land in controversy, and continued such ownership until his death. The appellants, James Donaldson and others, are nephews and nieces, and the descendants of deceased nephews and nieces, of said George Donaldson, and, when he died, were his next of kin. They are all residents of Scotland, and subjects of the Sovereign of the United Kingdom of Great Britain and Ireland. These appellants will be hereinafter called the "Scotch Claimants". The decedent also left surviving him James Fraser and others, constituting a group of remote kindred, all of whom are citizens of the United States. These persons were defendants in the court below, but did not appeal. On September 11, 1903, the Scotch Claimants executed a deed for the land in dispute to appellant John T. Stout, a resident citizen of Indiana. The consideration recited in the deed is $4,000. No consideration has yet been paid, but, by written contract, it shall be payable when the question of title shall have been determined. The court finds that the value of the lands in 1903 was $20,000, and, at the time of the hearing, $25,000. It was never cleared, and is covered with virgin forest. In 1901, the trial court appointed a receiver to hold possession of, and care for the land pending the litigation. The receiver held possession until May, 1906, when he made a report and resigned, and was discharged. In 1906 and since, the trustees of Indiana University have kept a university student

on the land, who has been pursuing advanced studies on scientific subjects, and, in his studies, making use of the fauna, flora, etc., found on the land. The trustees erected a house there for the student and pay him the sum of $500 per annum, in consideration of which, pursuant to the instructions of the trustees, he has been caring for the property, and has constructed fencing, etc. From 1883 to 1897, George Donaldson, decedent, was a *bona fide* resident of the state of Alabama.

Finding No. 21, is as follows: "At the time of the death of the aforesaid George Donaldson he was a *bona fide* resident of Scotland and a subject of the Sovereign of the

1. Dominion of the United Kingdom of Great Britain and Ireland." Appellants assail this finding as not sufficiently supported by the evidence. The facts disclosed by the evidence show that while decedent was residing in the United States, between 1860 and 1897, he frequently "visited" Scotland for short periods. From 1883 to 1897, he resided in the vicinity of Mobile, Alabama, with Carolina P. Dawson, Rose Earle Dawson and Hannah Harrison Dawson, daughters of a deceased friend. When he died, he owned real estate in Scotland, Alabama, Wisconsin and Indiana.

Disinterested witnesses testified that when decedent left Mobile, on his last trip to Scotland, in August, 1897, he stated that he was going to Scotland on a visit. Carolina P. Dawson, a beneficiary under his will, testified that when he left Alabama in 1897, he took as baggage only a small trunk and handsatchel, and left there, books, clothes, private business papers, and a lot of curios. Rose E. Dawson, another beneficiary under the will, testified that decedent told her he was going to Scotland for his health; that previously he had told her he wanted to be buried in this country. He had been in Scotland about one year when he was taken ill, and died soon thereafter. He owned quite a quantity of personal property, situate in Scotland.

James Donaldson, appellant, of Glasgow, Scotland, nephew of decedent, deposed as follows: Saw decedent's will and codicil, and heard them read, by a member of a firm of solicitors, in Glasgow. The instruments were in the handwriting of decedent, but were not witnessed. They were admitted to probate, in Scotland, because they were held sufficient to carry decedent's estate, so far as situated in Scotland, to the beneficiaries therein named. "He (decedent) came from America in the beginning of 1896 (1897?) and resided in the village of Maidens, Ayrshire, until his death, in September, 1898. I carried out the funeral arrangements and brought the body from Maidens to Glasgow, and buried it beside the remains of his wife, Janet Dick, in my father's burial place, in the Glasgow necropolis."

Henry A. Rannie, age 75, of Glasgow, gave his deposition, in behalf of appellants, as follows: Knew decedent since 1852. In 1853, married a Miss Hamilton, an adopted daughter of decedent. The latter lived with deponent and his wife from 1853 to 1859. He was of "sporting tastes" and "fond of shooting". In 1890, in company with Carolina P. Dawson, of Alabama, he visited Scotland for a few months, and while there, lived with deponent at Glasgow. "George Donaldson again visited Scotland about the year 1896 (1897?). He took very ill, and resided with, and was nursed to convalescence, by my daughter, Mrs. Henry Ker, 2 Park Circus, Ayr. who is also mentioned in his will. George Donaldson afterward, visited the village of Maidens, Ayrshire, and died there on 17th September 1898, aged 87." Deponent was present at the reading of the will. "It was read immediately after the funeral in the office of his solicitors, Messrs. Mitchells, Johnston & Company, 160 West George Street, Glasgow, in the presence of the family relatives, and others interested." Mary Ann Walker, niece of decedent, and appellant here, of Kilmalcolm, Scotland, deposed: "I occasionally saw my uncle after he went to America during his three or four visits to this country. On

the occasion of his visit to Scotland in 1890, he came to visit me at my house and brought along with him Miss Lena Dawson, who is a beneficiary under his will. * * * I was present at his solicitors' office in Glasgow when his will was read immediately after the funeral."

Copies of the will and codicil, of decedent, and probate thereof, as shown by the public records, of Scotland, were in evidence. The will, among other things, recites: "Know all men by this, my last will and testament, that I, George Donaldson, formerly merchant in Glasgow, being aware of the uncertainty of life, I do hereby, of my own free will and accord, dispose of the whole of my heritable and personal property", etc. The will concludes as follows: "Signed by me (signed) George Donaldson, on 23d day of December 1897, at Ardrossan, Aryshire, Scotland. My titles, securities, and other papers are in possession of my friends, Messrs. Turnbull, Parnie and Adam, 27 Union St., Glasgow, and others in the hands of Miss Lina Dawson, Mobile, Springhill, Alabama."

By the terms of the will he gave to the said Dawson women, of Alabama, the Wisconsin and Alabama real estate, and to each of them, a legacy of one thousand pounds sterling. The Indiana land was directed to be sold by the executors. Certain real estate in Glasgow was devised to George A. Rannie, son of deponent Henry A. Rannie, who married decedent's adopted daughter; other real estate in Glasgow was directed sold. By the terms of the codicil, executed at Maidens, Scotland, May 27, 1898, decedent gave to said Hannah H. Dawson "all my silver plate, and tea service, part of which is in possession of Mrs. Henry Ker, No. 2 Park Circus, Ayr., for safe keeping": this provision follows: "and all the residue of my estate, both real and personal, I hereby convey * * * to * * * Carolina Priolmean Dawson, Rose Earle Dawson and Hanna Harrison Dawson". After the signature to the codicil, appears the following: "A valuable oil painting titled the 'Price of Blood'

by Thomas Noble, and signed by him, is for safe keeping in possession of Mrs. Henry Ker, Ayr, and forms part of my residuary estate". The codicil recites "I hereby nominate and appoint the following executors, Mr. Thomas Adam, accountant 27 Union St. Glasgow, and Mr. Ernest D. Ker, son of Colonel Henry Ker, shoe manufacturer, Ayr, and also Miss Carolina P. Dawson as my executrix, living at Springhill, Mobile county Alabama, America, conjointly with Mr. Richard Jones, senior Clerk of Court in the town of Mobile Alabama". No one of his next of kin was made a beneficiary, either in the will, or codicil.

Was decedent, when he died, a resident of Alabama, or of Scotland? It was incumbent on the State to adduce some evidence to overcome the presumption that there was no change of residence after his departure from Alabama. The evidence, as often happens in cases of this kind, is meager. The principal facts and circumstances shown, and on which the finding of the court was based, have been set out in this opinion. It is somewhat significant that after his arrival in Scotland, in 1897, if he ever made any declaration of any intent to return to America, there is no evidence of such declaration. If he ever performed any act, denoting a purpose to return to America, there is no evidence. He was an old man, in the land of his original domicil, and of which he was ever a citizen. He was among his kindred, and was nursed back to convalescence by the daughter of a woman who had been adopted by him as a child more than a half a century before. He owned houses in Glasgow. When he wrote his will, in which he expressly states that he was considering the uncertainty of life, he makes no provision for his burial in Alabama. He describes himself in the will as "formerly merchant in Glasgow". Both documents are written in conformity with the Scotch law, but not entitled to probate in Alabama, Indiana or Wisconsin. He had solicitors in Glasgow, and they held securities and other papers belonging to him. His will was pro-

duced and read, at the office of his solicitors, immediately after his funeral. His silver plate and tea service were in the hands of the child of his adopted daughter, for safe keeping until after his decease; likewise the valuable oil painting. The will and codicil contain strong evidence of having been written by one who considered himself a resident of Scotland. The inference that he intended them probated there is surely warranted.

It is inferable that his serious illness, through which Mrs. Ker nursed him to convalescence, occurred shortly after his arrival in Scotland. He afterwards went to Maidens, and died there. His last illness commenced about one year after his arrival in Scotland, which would be not far from September 1, 1898. The codicil was executed at Maidens, May 27, 1898. This was evidently after the convalescence from the first illness. His previous visits to Scotland had been of short duration—a few months each. Had he intended to return to America, the summer time would appear most favorable to a person of his advanced age. His nephew, appellant here, "carried out the funeral arrangements" and took the body to the Glasgow necropolis and buried it beside that of Janet Dick, the wife of his youth. Whether decedent left any request relating to the funeral arrangements is not disclosed by the evidence.

It is the function of the trial court to weigh evidence, and determine what facts were proven. It is beyond the rightful power of this court to disturb a finding that has

2. any evidence to support it. There is evidence here to rebut the presumption that decedent's place of residence was not changed, and taking into consideration all the facts and circumstances disclosed, and all the inferences that might rightfully have been drawn from them by the trial court, we can not say that there was no evidence to support the finding, and consequently it is beyond our power to interfere with it. Dicey, Conflict of Laws (Am. ed.) 132, 133; Jacobs, Law of Domicil §§109, 369, 455, 463,

466; *Hampden* v. *Levant* (1871), 59 Me. 557; *Butler* v. *Farnsworth* (1821), 4 Wash. C. C. 101, 4 Fed. Cas. No. 2,240; *Elbers & Kraffts* v. *United Ins. Co.* (1819), 16 Johns. 128; 14 Cyc. 858; authorities cited in *Donaldson* v. *State, ex rel.* (1906), 167 Ind. 553, 556, 557, 78 N. E. 182.

On the facts found the court concluded as a matter of law that the title of the land escheated to the State, and that appellants have no interest therein. Appellants' exceptions to the conclusions of law, and to the rulings on demurrers to the complaint, involve the same legal questions, and will be considered together. Other questions involved in the ruling on demurrers, and in the conclusions of law, will be considered later.

Appellants, the Scotch Claimants, claim title by virtue of certain statutes of Indiana, in relation to aliens. These statutes are as follows: "Sec. 1. No person except a citizen of the United States, or an alien who shall be at the time a *bona fide* resident of the United States, * * * shall take, hold, convey, devise, or pass by descent, lands, except in such cases of descent or devise as are provided for by law * * * ". Acts 1861 p. 153, §3936 Burns 1914. "Sec. 1. Natural persons who are aliens, whether they reside in the United States or any foreign country, may acquire, hold and enjoy real estate, and may convey, devise, mortgage or otherwise incumber the same, in like manner and with the same effect as citizens of this State." Acts 1881 (s. s.) p. 84, §2967 R. S. 1881, §3389 Burns 1901, §4010 Burns 1914. "Sec. 2. All laws, or parts of laws, in conflict with the provisions of this act are hereby repealed." Acts 1881 (s. s.) p. 84, §2. "Sec. 1. * * * all aliens residing in the State of Indiana who shall have declared their intentions to become citizens of the United States * * * may acquire and hold real estate in like manner as citizens of this State." Acts 1885 p. 79, §3332 Burns 1894. "Sec. 2. All other aliens may take and hold lands by devise and descent only, and may convey the same at any time within

five years, and all land so left and remaining unconveyed at the end of five years, shall escheat to the State." Acts 1885 p. 79, §3333 Burns 1894. "Sec. 3. Nothing herein contained shall prevent the holder of any  *  *  * interest in real estate heretofore acquired, from taking a valid title to the real estate in which he has such interest,  *  *  * ." Acts 1885 p. 79, §3334 Burns 1894.

It is claimed by appellants, Scotch Claimants, and their grantee Stout, that the above acts of 1861, 1881 and 1885, were all in effect when George Donaldson died, and that claimants, his next of kin, took title to the land under §2 of the act of 1885, and lawfully conveyed it to appellant Stout within five years thereafter pursuant to the provisions of the same section. It is claimed by the Attorney-General that the act of 1861 was repealed by the act of 1881, and the latter was repealed by the act of 1885; it is also claimed by him, that conceding all three acts to have been in effect when George Donaldson died, still the Scotch Claimants took nothing because the ancestor, having died a nonresident alien, was without power to transmit, or pass, by descent, any title to his next of kin.

These contentions require a consideration of the *status* of aliens, in relation to real estate titles, at common law, as modified by the several statutes above quoted. At common law an alien had capacity, by deed or other act of purchase, to take, hold and convey real estate against all except the State, and even against the latter until it might obtain a judgment by inquest of office, or office found, or equivalent. 1 Blackstone, Comm. 372; 2 Blackstone, Comm. 274, 293; 1 Coke on Littleton 2a, b; 2 Cyc. 90-96, and authorities cited; 1 Washburn, Real Property *48, §22; *Fairfax's Devisee* v. *Hunter's Lessee* (1813), 7 Cranch 602, 3 L. Ed. 453, opinion by Mr. Justice Story; *Halstead* v. *Board, etc.* (1877), 56 Ind. 363; *Wunderle* v. *Wunderle* (1893), 144 Ill. 40, 33 N. E. 195, 19 L. R. A. 84; *Oregon Mortgage Co.* v. *Carstens* (1896), 16 Wash. 165, 47

Pac. 421, 35 L. R. A. 841, and cases cited. An alien, at common law, could not take, or pass, or transmit, title to realty by descent, because he had no inheritable blood. *Fairfax's Devisee* v. *Hunter's Lessee, supra;* 1 Comyn's Digest, "Alien" (C) 556; 2 Blackstone, Comm. 274; 2 Cyc. 94-96; *Eldon* v. *Doe* (1842), 6 Blackf. 341; *Doe* v. *Lazenby* (1848), 1 Ind. 234; *Murray* v. *Kelly* (1866), 27 Ind. 42. If the alien died intestate, seized of land, it immediately vested in the State by escheat. 2 Cyc. 94-96, and authorities cited; *Crane* v. *Reeder* (1870), 21 Mich. 24, 4 Am. Rep. 430; *Sands* v. *Lynham* (1876), 27 Grat. (Va.) 291, 21 Am. Rep. 348.

While all modern states have laws of devise and descent, it can not be doubted that the capacity to transmit and take title to immovable property by devise or descent is a creature of the law of the state where such property may be situated. *Truelove* v. *Truelove* (1909), 172 Ind. 441, 86 N. E. 1018, 88 N. E. 516, 27 L. R. A. (N. S.) 220, 139 Am. St. 404; *United States* v. *Fox* (1876), 94 U. S. 315, 24 L. Ed. 192; *Plummer* v. *Coler* (1900), 178 U. S. 115, 20 Sup. Ct. 829, 44 L. Ed. 998, and cases cited; *Magoun* v. *Illinois Trust, etc., Bank* (1898), 170 U. S. 283, 18 Sup. Ct. 594, 42 L. Ed. 1037, and cases cited; *Mager* v. *Grima* (1850), 8 How. 490, 12 L. Ed. 1168; *Noel* v. *Ewing* (1857), 9 Ind. 37, 45; *State* v. *Hamlin* (1894), 86 Me. 495, 30 Atl. 76, 41 Am. St. 569, 25 L. R. A. 632, and cases cited. In *Mager* v. *Grima, supra,* the court by Mr. Chief Justice Taney, said: "the law in question is nothing more than an exercise of the power which every state and sovereignty possesses, of regulating the manner and terms upon which property, real or personal, within its dominions, may be transmitted by last will and testament, or by inheritance; and of prescribing who shall and who shall not be capable of taking it. * * * If a state may deny the privilege altogether, it follows that, when it grants it, it may annex to the grant any conditions which it supposes to be required by its interests or policy". In *United States* v. *Fox, supra,* Mr. Justice Field, speaking

for the court, said: "The power of the state to regulate the tenure of real property within her limits, and the modes of its acquisition and transfer, and the rules of its descent, and the extent to which a testamentary disposition of it may be exercised by its owners, is undoubted. It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated. *McCormick* v. *Sullivant* [1825], 10 Wheat. \*192, \*202, 6 L. Ed. 300. The power of the state in this respect follows from her sovereignty within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the Federal government. The title and modes of disposition of real property within the state, whether *inter vivos* or testamentary, are not matters placed under the control of the Federal authorities." In *State* v. *Hamlin, supra,* 504, it was said by the supreme court of Maine: "The constitution guarantees to the citizen the right of acquiring, possessing and protecting property, Art. 1, Sec. 1, which includes also, the right of disposal. *But the guaranty ceases to operate at the death of the possessor.* [All italics ours.] There is no provision of our constitution, or that of the United States, which secures the right to any one to control or dispose of his property after his death, *nor the right to any one, whether kindred or not, to take it by inheritance. Descent is a creature of statute,* and not a natural right. \* \* \* The right to dispose of estates by will is of very ancient origin, but is a creature of municipal law, *and not a natural right.* Redfield on Wills, C. 1, §1." A philosophical discussion of the origin and progress of the laws of descent, and of wills, is found in 2 Blackstone, Comm. 10-13.

It may be conceded that by §3 of the act of 1885, appellants, Scotch Claimants, who were nonresident aliens, had capacity, in 1898, to take title to the land, and hold it for

five years only. It may also be conceded, in any view
5. concerning the repeal of the acts of 1861 and 1881,
that George Donaldson's title to the land was protected by §3 of the act of 1885. The land was acquired when the act of 1861 was unquestionably in force, and when George Donaldson was a resident alien. This statute conferred on him, while he remained a resident of the United States, the capacity to "pass by descent" the title to the land. He could not transmit by descent until his death. The statute confers the capacity to transmit by descent on an alien only who shall "at the time" (when descent is cast) be "a bona fide resident of the United States". At the time of death, he was a nonresident, and consequently not within the class of aliens on whom the statute conferred the capacity to transmit by descent. The power to
6. transmit by descent, as well as the power to take by inheritance, are mere rights in expectancy, that do not vest until the death of the intestate. Appellants concede the latter proposition, but deny the former. Precedent and reason alike contravene appellants' contention, as shown by authorities heretofore cited

Previous to the act of 1852, widows, in this State, were, by statute, endowed of a third part of all lands the legal or equitable title to which was in their husbands, at any time during coveture, unless their rights had been legally barred. R. S. 1843 p. 428. By the act of 1852, dower was abolished, and in lieu thereof the widow was given a third, in fee simple. 1 R. S. 1852 p. 248, §§3012, 3013, 3014, 3029, 3037 Burns 1914.

*Noel* v. *Ewing, supra,* involved a case where the marriage occurred in 1826 and the husband died in 1854. Previous to 1849, and after his marriage, he acquired a large landed estate. He made his will in 1849, disposing of the land, and made certain provisions, in lieu of dower, for his widow. The widow elected to take under the law, and claimed a third in fee simple, under the act of 1852. It was con-

tended on behalf of the devisees that at the time of the purchase of the land, the entire fee simple rested in the husband; that he could, under existing law, convey it by deed while living, and transmit it by devise or descent at his death, subject only to the wife's right of dower—a right to the use of one-third of it during the years she might outlive her husband: that the law ought not to be so construed as to deprive him of the right to transmit title, by devise, to the third of the fee simple of the property. The contention of the devisees failed, the court holding that dower was a creature of statute. In other cases, by reason of the abolition of dower, by the act of 1852, the widow was deprived of everything. *Coleman* v. *DeWolf* (1876), 53 Ind. 428; *Taylor* v. *Sample* (1875), 51 Ind. 423; *Bowen* v. *Preston* (1874), 48 Ind. 367. The reasoning in support of the rulings of this court in the dower cases, is closely analogous to that in support of the proposition that no right to inherit, or pass by descent, can vest before the death of the intestate. It is our conclusion that, considering the act of 1861 to have been in force at George Donaldson's death, it conferred on him no capacity to transmit title to his next of kin.

Did the act of 1881 confer on decedent the right to transmit to his next of kin, title to real estate? A reading of the statute shows that while the act confers on nonresident aliens (such as was decedent) the capacity to acquire, hold and enjoy real estate, and to convey, devise, mortgage or otherwise incumber it, it wholly fails to include any capacity on the part of such aliens to transmit by descent. Appellants earnestly contend that the act should be liberally construed, and, so construed that it must be held that the capacity to "acquire" land, and "hold" and "enjoy" it, until death, intestate, by necessary implication, includes the capacity to transmit it by descent to next of kin. At common law the alien possessed no power to transmit title either by devise or descent. The capacity of such

alien (or even citizen) for either, is a creature of statute. It can not be rationally said that conferring one of such powers by legislative authority, necessarily includes the other. Legislative history of the granting of such powers refutes the claim. *State* v. *Hamlin, supra,* and cases cited. The very act of 1861, claimed by appellants, to be in force, is a witness against any such contention, for in that statute the power to devise, and the capacity to transmit, by descent, were severally granted. This act of 1881, read in the light of the statute of 1861, is its own best interpreter, and requires neither liberal nor strict construction, but simply an interpretation in consonance with the generally understood meaning of the words used in declaring the legislative will. The General Assembly had the power to confer on nonresident aliens the capacity to transmit by devise, and withhold capacity to transmit by descent. This power it exercised, and whether wisely or unwisely, is a proper subject of political discussion, but not for judicial determination. We are therefore constrained to hold that the act of 1881, if in force in 1898, conferred no capacity on George Donaldson to transmit by descent the title to the land in controversy. It is not contended by appellants that any such power was conferred by the act of 1885, and, in view of what has been said, it is unnecessary to consider the Attorney-General's contention that neither the act of 1861 nor that of 1881 was in force when decedent died.

In concluding their brief appellants say that "England, Donaldson's mother country, more than forty years ago emancipated us by her alien land statute. * * * Public conscience would be offended, and an inexcusable wrong done to a dead adversary, if, at this late day, by judicial construction, the act of 1881, should be transformed from 'an act to authorize aliens to hold titles to real estate, to convey the same, etc.,' into an 'act to confiscate to the State, the titles of aliens in lands heretofore acquired' ''. If any question of international comity can be involved in construing

the statutes of a State, relating to the devolution of titles of decedents (in the absence, as here, of rights guaranteed by treaty) it might not be amiss to suggest that the devisees under the will of George Donaldson, rather than his next of kin, might more appropriately raise it. It was not his intention that any one of appellants should partake of his bounty. His intention to give all his estate to others is clearly manifested in his will. By the laws of the country where he was born, and made his will, and died, that intention would have been given effect. Here, the law limits the power to transmit property by devise, and permits it only where the will is attested by at least two witnesses. By reason of the arbitrary provisions of our statute—provisions unknown to the laws of Scotland—and for no other reason, appellants are here claiming the title formerly owned by their kinsman; and, in our judgment, this claim must be denied for the same reason that the claim of the devisees, if presented, would be denied—lack of statutory authority.

There was no error, available to appellants, in the court's conclusions of law, or in its rulings on appellants' demurrers to the various paragraphs of complaint.

While this action was pending, in 1903, the General Assembly of this State enacted the following statute: "Section 1. Be it enacted by the General Assembly of the State of Indiana, That in all cases where lands located in Lawrence or Monroe County have escheated, or hereafter shall escheat to the State for want of heirs or kindred entitled to the inheritance, such lands shall not be sold by the Board of Commissioners of the county where such estate is situated, but the title to all of such lands shall be and remain in the State of Indiana, and such lands shall be devoted to educational purposes. "Sec. 2. The control and management of all such lands shall be vested in the Trustees of Indiana University, and such lands may be used by said trustees for any proper educational purposes. Sec. 3. Said Board of Trustees may in its discretion set off any portion of such

grounds to the use of the State Board of Forestry or to that of Purdue University, or any other educational or scientific institution of the State.'' Acts 1903 p. 152.

In December, 1910, an amended complaint was filed, to which John T. Stout, grantee of the Scotch Claimants was made a defendant. The trustees of Indiana University were not made parties to such amended complaint. At the same time Stout filed a cross-complaint against plaintiff, the trustees of Indiana University, and others, to quiet his alleged title to the lands in controversy. To this cross-complaint the university trustees answered that pursuant to the provisions of the above quoted act of 1903, they are in control and management of the land, and, since the death of Donaldson, have been seized of the exclusive possession thereof, and are entitled to the control, management and possession of the land to the exclusion of said cross-complainant and everybody else. The trial court overruled Stout's demurrer to this answer, which action is here assigned as error. In conclusion of law number one it is stated that ''the lands * * * have escheated to the State of Indiana and that the title thereto is in the State of Indiana and should be quieted, and that defendant Indiana University is the legal custodian of said lands''. The judgment rendered follows the conclusions of law.

In the oral argument of this cause, heard March 5, 1913, appellants contended most earnestly that the act of 1903, in relation to the State university, is void because in conflict with Art. 8, §2, and Art. 4, §22 of our State Constitution. It is provided in Art. 8, §2, that the common-school fund shall consist, among other things, of ''All lands and other estate which shall escheat to the state * * * ''. Section 22 of Art. 4, forbids local or special legislation in ''Providing for supporting common schools and for the preservation of school funds''. The constitutional provisions were made effective by appropriate legislation, §§3003, 3004 Burns 1914, §2477 R. S. 1881, Acts

1883 p. 98. The latter section provides for the sale of escheated estates by boards of county commissioners. These statutes were in effect in 1898. By §7, of Art. 8 (relating to education) of our Constitution, it is provided that all trust funds held by the State shall remain inviolate, and be faithfully and exclusively applied to the purposes for which the trust was created. Section 3, of the same article, permits the increase of the principal of the common-school fund but inhibits its diminution, and requires that the income be inviolably appropriated to the support of common schools. It can scarcely be doubted that under our Constitution, and laws enacted in pursuance thereof, the land in controversy escheated to the State of Indiana, and vested in the State, on the death of George Donaldson; and, until sale thereof, pursuant to §3004 Burns 1914, *supra*, the State held and holds the title, in trust, for the benefit of the common-school fund. *State, ex rel.* v. *Meyer* (1878), 63 Ind. 33.

Courts will not declare legislative acts unconstitutional, where there is doubt. Is there any doubt that the act of 1903 is local and special within the meaning of Art. 9. 4, §22 of our Constitution? This act prevents the sale of escheated lands located in Lawrence and Monroe counties. There may be a classification of localities, relating to the application of laws, which will not violate the provision under consideration, but such classification, to be valid, must be based on reasonable grounds. *Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671, 80 N. E. 529, 14 L. R. A. (N. S.) 418; *School City of Rushville* v. *Hayes* (1904), 162 Ind. 193, 70 N. E. 134; *Bullock* v. *Robinson* (1911), 176 Ind. 198, 93 N. E. 998, and cases cited. We preceive no sufficient reason for excluding from sale, escheated lands in Lawrence and Monroe counties, and thereby preventing the proceeds of their sale from incorporation in the common-school fund of Indiana, and consequently the act in question must be held invalid because in conflict with Art. 4, §22 of our Constitution.

It by no means follows that appellant Stout can rely on such invalidity to support his cross-complaint to quiet title. If he recover, on his cross-complaint, it must 10. be on the strength of his own title rather than on the weakness of his adversary's. A bad answer is sufficient for a bad cross-complaint. The court did not err in overruling the demurrer to the answer of the university trustees to the cross-complaint of appellant Stout, because, as heretofore determined, Stout had no title to the land.

Is the validity of the act of 1903 necessarily involved in the ruling on appellants' demurrers to the plaintiff's amended complaint, filed in 1910? Here the situa- 11. tion is reversed. The plaintiff must recover, if at all, on the strength of its own title, as alleged, and not on the weakness of appellants'. The act of 1903, purports to prevent indefinitely the sale of the land, and to vest the use, control and management of it in the university trustees, and leave the State with only a naked legal title. If this act is valid, the real party in interest, after the act went into effect, was the university and not the State. *Chapman* v. *Jones* (1898), 149 Ind. 434, 47 N. E. 1065, 49 N. E. 347, and cases cited. Where the complaint, in an action to quiet title, on the face thereof, shows that the plaintiff is not the real party in interest, and is not the owner of the land, a demurrer for want ·of facts should be sustained. *Chapman* v. *Jones, supra,* and cases cited; §§251, 252 Burns 1914, §§251, 252 R. S. 1881; *Indiana, etc., Oil Co.* v. *Sexton* (1903), 31 Ind. App. 575, 68 N. E. 692; *Coppock* v. *Austin* (1904), 34 Ind. App. 319, 72 N. E. 657; *Corbin Oil Co.* v. *Searles* (1905), 36 Ind. App. 215, 75 N. E. 293. After the legislation of 1903, if valid, any question between the plaintiff and appellants regarding any beneficial interest in the land, became a moot one, for the university trustees were not parties to the complaint, and could not be bound, and the court in such event, would have erred in permitting the complaint to be amended, or other rulings made, to which

appellants excepted. It follows therefore, that the validity of the act is involved. We have already stated that the act is invalid, and consequently, the plaintiff was the real party in interest, and the court did not err in overruling the demurrers to the amended complaint.

There is error in the first conclusion of law, in so far as it states that the university is the legal custodian of the lands, and there is error in the judgment in so far as it follows the erroneous conclusion of law. The error does no substantial harm to appellants, and it is not such as to warrant a reversal of the judgment and the granting of a new trial. However, the judgment should be modified by eliminating the erroneous portion thereof. §§702, 703 Burns 1914, §§660, 661 R. S. 1881; *Louisville, etc., R. Co.* v. *Treadway* (1895), 143 Ind. 689, 40 N. E. 807, 41 N. E. 794; *Dorsey* v. *State* (1913), 179 Ind. 531, 100 N. E. 369.

Other questions are presented, but they involve no error.

It is ordered that the clause "and that the possession and control of the same is vested in the trustees of Indiana University", be stricken from the judgment, and, so modified, the judgment is affirmed.

NOTE.—Reported in 101 N. E. 485. As to property subject to escheat to State, see Ann. Cas. 1912 D 382. As to power of aliens to hold land, see 14 Am. Dec. 97. On the question of inheritance by, through, or from alien, see 31 L. R. A. 177. As to tracing descent through alien, see 37 L. R. A. (N. S.) 108. See, also, under (1) 16 Cyc. 556; (2) 3 Cyc. 345; (4, 5, 7) 2 Cyc. 97; (6) 14 Cyc. 15; (8) 16 Cyc. 558; (9) 36 Cyc. 1010; (10) 31 Cyc. 338.