A.——— B.——— *v.* C.——— D.———.

[Filed December 29, 1971. Rehearing denied February 2, 1972.
Transfer denied July 20, 1972.]

---

20. *McCoy* v. *Able* (1891), 131 Ind. 417, 30 N. E. 528, 31 N. E. 453; *Debs* v. *Dalton* (1893), 7 Ind. App. 84, 34 N. E. 236.

*Marshall F. Kizer, Kizer and Neu,* of Plymouth, for appellant.

*Paul Reed,* of Knox, *John L. Richert,* of Winamac, for appellee.

WHITE, J.—Defendant-appellee was married to plaintiff-appellant's present wife at the time she conceived and bore a son. She thereafter divorced defendant and married plaintiff. In the divorce decree she was awarded custody of the son as a child of the marriage. Plaintiff-appellant brought this declaratory judgment action to have himself declared the

legitimate father of the child. The rationale of the action is that the child was born illegitimate, (or "out of wedlock"), by reason of the fact that its mother's then husband is not its biological father[1], and that it has been legitimatized as plaintiff's son by plaintiff's marrying the mother and acknowledging the child as his own.

The trial court entered summary judgment for defendant upon finding

> "that plaintiff has no statutory authority, standing or jurisdiction to bring this action. The Court further finds that it would be against public policy to permit such an action under the facts of this case."

The factual situation which plaintiff alleges may be far from common, but it is not unique. Married women have borne children conceived in adultery and, after divorce from their husbands, some have married their children's biological fathers. In at least two jurisdictions the resulting variance between the legal and the natural paternal relationships can be eliminated by remolding the legal to conform with the natural. In one California case, a judicial decree made the child the legitimate child of the second marriage.[2] In New York there are several cases indicating that such a result

---

1. Plaintiff supports this conclusion by citing *Pursley* v. *Hisch* (1949), 119 Ind. App. 232, 235, 85 N. E. 2d 270, which states:

"As used in the Uniform Illegitimacy Act, after which our Act is closely patterned, the term 'wedlock' refers to *the status of the parents of the child in relation to each other*. A child born to a married woman, but begotten by one other than her husband, is a child 'born out of wedlock' within the purview of the statute. *State of North Dakota* v. *Coliton* (1945), 73 N. D. 582, 17 N. W. 2d 546, 156 A. L. R. 1403."

2. *Serway et al.* v. *Galentine* (1946), 75 Cal. App. 2d 86, 170 P. 2d 32. Under a California statute permitting legitimacy to be disputed *only* by husband or wife or descendant of one or both, natural father was not proper plaintiff, but the child was. Action was under statute permitting action to have "declared the existence or non-existence between the parties of the relation of parent and child. . . ." Legitimation was by natural father's marriage of mother and "adoption" of child as his own. See also *In re Stroope's Adoption* (1965), 232 Cal. App. 2d 581, 43 Cal. Rptr. 40.

can be achieved in a declaratory judgment action.[3] Whether there are other jurisdictions in which the same result could be or has been judicially achieved, we are not informed.[4] We are satisfied, however, that the present substantive law of Indiana, with respect to legitimation, differs so little from the common law of England in Blackstone's time[5] that such a result is *substantively* unattainable, procedural questions aside. Blackstone concluded his discussion of the parent-child relationship with a statement which, in substance, is the law of Indiana today. It reads:

> "A bastard may, lastly, be made legitimate, and capable of inheriting, by the transcendent power of an act of parliament, *and not otherwise* as was done in the case of John of Gaunt's bastard children, by a statute of Richard the Second."[6] (Our emphasis.)

In Indiana an illegitimate is capable of inheritance from and through its mother (and she through and from him) and he may be rendered capable with respect to his father "if but only if, (1) the paternity of such child has been established by law during father's lifetime; or (2) if

---

3. *Melis* v. *Dept. of Health, City of N.Y.* (1940), 260 App. Div. 772, 24 N. Y. S. 2d 51; *P.* v. *Dept. of Health* (1951), 200 Misc. 1090, 107 N. Y. S. 2d 586; *Hines* v. *Hines* (1957), 12 Misc. 2d 486, 169 N. Y. S. 2d 1003; *Roe* v. *Roe* (1966), 49 Misc. 2d 1070, 269 N. Y. S. 2d 40; *C.* v. *Ingraham* (1969), 31 A. D. 2d 429; 298 N. Y. S. 2d 545; *Roe* v. *Roe* (1970), 65 Misc. 2d 335, 316 N. Y. S. 2d 94.

4. A Kentucky case, although not directly in point, involves the same basic facts. It holds that legitimation to the second husband cannot be accomplished even under a legitimation statute apparently identical to our 1852 act (Burns 1933, § 6-2310). "That statute relates to illegitimate children; the child involved in this litigation was born in lawful wedlock and has never been illegitimate." *Commonwealth* v. *Helton* (Ky. 1967), 411 S. W. 2d 932, 934.

5. He began his "Venecian lectures" at Oxford University on October 25, 1758. 1 Blackstone, COMMENTARIES 3. (Lewis Ed., 1898, p. 3).

6. 1 Blackstone, COMMENTARIES, 446-459, Ch. XVI, "Of Parent and Child." See note 8, post, questioning the Indiana General Assembly's power to legitimate by private act. See also *Lund's Estate* (1945), 26 Cal. 2d 472, 159 P. 2d 643, 162 A. L. R. 606, 611; *Pfeifer* v. *Wright* (10th Cir. 1930), 41 F. 2d 464, 466.

the putative father marries the mother of the child and acknowledges the child to be his own,"[7] but *there is no way he can be made legitimate.*[8] Such, however, was not always our law.

From 1831 until 1954 a child which was born illegitimate became legitimate by its mother's subsequent marriage if her husband acknowledged the child as his own.[9] The 1831 statute which thus provided for legitimation by subsequent marriage was apparently the first introduction of that civil law principle of legitimation into Indiana law.[10] It was reenacted in 1843 and 1852. 1 R.S. 1852, Ch. 27, § 9 (formerly Ind. Ann. Stat. § 6-2310 [Burns 1933]) provided:

> "If a man shall marry the mother of an illegitimate child, and acknowledge it as his own, *such child shall be deemed legitimate.*" (Emphasis added.)

7. Quoted words from section 207 of the Probate Code which was enacted by Ind. Acts 1953, Ch. 112, § 207, p. 295, and is now cited as IC 1971, 29-1-2-7, also Ind. Ann. Stat. § 6-207 (Burns 1953).

8. We have made no search for private legitimating acts in Indiana, but we have found evidence of their early use in other American states. *Edmondson* v. *Dyson* (1849), 7 Ga. 512. Whether the prohibition of Art. 4, § 22, cl. 6, Ind. Const. against local or special laws "changing the names of persons" prohibits private legitimation statutes we do not presume to decide. Although it may have no direct bearing on this case, we note that, in Indiana, even adoption does not make an illegitimate child the legitimate child of his adoptive parents. Such was our holding in *Blackford* v. *Barnhill* (1949), 119 Ind. App. 257, 260, 84 N. E. 2d 64. The Probate Code, adopted since that time, made changes with regard to the inheritance rights of adopted children, but left unchanged their status as to legitimacy or illegitimacy. Probate Code § 208, Ind. Acts 1953, Ch. 112, § 208, as last amended by Acts 1969, Ch. 254, § 1, now cited as IC 1971, 29-1-2-8, also Ind. Ann. Stat. § 6-208 (Burns 1971). See 2 Henry's PROBATE LAW (Grimes' 1954 ed. and 1970 Supp.) § 12, p. 1409.

9. R. S. 1831, p. 208. See *Wilson* v. *Bass* (1918), 70 Ind. App. 116, 125, 118 N. E. 379. It was reenacted as R. S. 1843, Ch. 28, Art. 5, § 128, which is quoted in *Harvey* v. *Ball* (1869), 32 Ind. 98, 101.

10. The Lords and Barons refused to make it a part of English Law at the parliament of Merton. 1 Blackstone, COMMENTARIES 456. England did not adopt the civil rule until it enacted the Legitimacy Act of 1926 (16 & 17 Geo. 5). ESTER, *Illegitimate Children and Conflict of Laws,* 36 Ind. L. J. 163, 164 (1961).

It was expressly repealed, effective January 1, 1954, by the Probate Code,[11] and replaced by section 207 of the Probate Code [12], which reads as follows:

"(a) For the purpose of inheritance to, through and from an illegitimate child, such child shall be treated the same as if he were the legitimate child of his mother, so that he and his issue shall inherit from his mother and from his maternal kindred, both descendants and collaterals, in all degrees, and they may inherit from him. Such child shall also be treated the same as if he were a legitimate child of his mother for the purpose of determining homestead rights, and the making of family allowances.

"(b) For the purpose of inheritance to, through and from an illegitimate child, such child shall be treated the same as if he were the legitimate child of his father, if but only if, (1) the paternity of such child has been established by law, during the father's lifetime; or (2) if the putative father marries the mother of the child and acknowledges the child to be his own.

"The testimony of the mother may be received in evidence to establish such paternity and acknowledgment but no judgment shall be made upon the evidence of the mother alone. The evidence of the mother must be supported by corroborative evidence or circumstances.

"When such paternity is established as provided herein such child shall be treated the same as if he were the legitimate child of his father, so that he and his issue shall inherit from his father and from his paternal kindred, both descendants and collateral, in all degrees, and they may inherit from him. Such child shall also be treated the same as if he were a legitimate child of his father for the purpose of determining homestead rights, and the making of family allowances."

As was said in *Lund's Estate* (1945), 26 Cal. 2d 472, 159 P. 2d 643, 162 A.L.R. 606, 609:

---

11. See the note following Ind. Ann. Stat. § 8-218 (Burns 1953) which quotes in full the repealing section of the Probate Code, Ind. Acts 1953, Ch. 112, § 2501. The 1852 legitimation statute is section 9 of "An act regulating descents and the apportionment of Estates, approved May 14, 1852."

12. Ind. Acts 1953, Ch. 112, § 207, now IC 1971, 29-1-2-7, also Ind. Ann. Stat. § 6-207 (Burns 1953).

"Statutes under which a child born illegitimate can, by virtue of subsequent conduct of his father (or of both parents) become capable of inheriting from the father, are usually classified as either statutes of legitimation (under which the child can, in some jurisdictions, attain the full status of legitimacy), or statutes of succession (under which the child, although remaining illegitimate in social status, can, at least to a limited extent, inherit as if he were legitimate, or, as is sometimes said, under which he is legitimated for the purpose of inheritance only). (See, e.g., *Pfeifer* v. *Wright* (1930, CCA 10), 41 Fed. 2d 464 [73 ALR 932], cert den 282 US 896, 75 L ed 789, 51 S Ct 181; 2 Beale, Conflict of Laws (1935), 967, § 246.2; Rest., Conflict of Laws 329, § 246 and comments thereto.) . . ."

As we read that statute it is clearly of the second category. It contains no words even faintly resembling the legitimating words of the 1852 statute. These words were: "such child shall be deemed legitimate."

In *Pfeifer* v. *Wright* (10th Cir. 1930), 41 F. 2d 464, 466, the court quoted a Kansas statute, in pertinent part as follows:

" 'Illegitimate children inherit from the mother, and the mother from the children.

" 'They shall also inherit from the father whenever they have been recognized by him as his children; but such recognition must have been general and notorious, or else in writing.' "

The question of statutory interpretation in that case was the same as here although it arose in a more traditional manner, i.e., inheritance rights in a conflict of laws context. As stated by the court:

"The inquiry then is, whether on the facts stated in the bill this statute legitimated appellant, so as to give her the status of a lawful child, and thus make her an heir to decedent as such [in Oklahoma]; or whether the statute only made her an heir to decedent as an illegitimate, effectual only as to property in Kansas.

"We are unable to say that the statute relied on discloses a legislative intention to change the status of a child from illegitimate to legitimate. Its only purpose, so far as we are able to discover from its terms, is to give to an illegiti-

mate child as such the right to inherit from the father on the conditions named . . . ." (41 F. 2d at 467).

We have twice reached the same conclusion with respect to a very similar Indiana statute which was also replaced by § 207 of the Probate Code. It is Ind. Acts 1901, Ch. 126, § 1, p. 288, which reads in pertinent part as follows:

> "The illegitimate child or children of any man dying intestate and having acknowledged such child or children during his lifetime as his own shall inherit his estate, both real and personal, and shall be deemed and taken to be the heir or heirs of such intestate in the same manner and to the same extent as if such child or children had been legitimate . . . provided, That the provisions of this act shall not apply where the father of the illegitimate child, at his death, had surviving legitimate children or descendants of legitimate children." (Also Ind. Ann. Stat. § 6-2309 [Burns 1933]).

Of that statute we said in *Wilson* v. *Bass* (1918), 70 Ind. App. 116, 124, 118 N. E. 379:

> "It is argued in behalf of appellant that where an illegitimate child is acknowledged, under the provisions of § 3000, *supra*, [the section number of that statute in the Burns 1914 edition of Indiana Annotated Statutes] he becomes a legitimate child with full right of inheritance, in the absence of other legitimate children or their descendants, and hence that appellant in this case inherited from the mother of his putative father to the same extent that he would have inherited had he been born in lawful wedlock. We do not believe that the statute is reasonably susceptible of such a construction. The statute by its terms seems plainly to distinguish between an illegitimate and a legitimate child, extending to the former a right to inherit from the putative father only, under certain circumstances, in case of the absence of legitimate children. Thus, the language is to the effect that the illegitimate child of any man dying intestate shall inherit his estate to the same extent as if such child had been legitimate, provided that the act shall not apply where the father of the illegitimate at his death had surviving a legitimate child. A statute seems to recognize the illegitimate as illegitimate after acknowledgment.

"A comparison of § 3001 Burns 1914, § 2476 R.S. 1881, with § 3000, *supra,* confirms us in such conclusion. The former is as follows: 'If a man shall marry the mother of an illegitimate child and acknowledge it as his own, such child shall be deemed legitimate.' That section in substantially its present form has been in force since 1831. See R.S. 1831 p. 208; R.S. 1843 p. 438; R.S. 1852 p. 249. Under that and similar statutes the status of the child is changed from illegitimacy to legitimacy. *Harness* v. *Harness, supra;* [(1911), 50 Ind. App. 364, 98 N. E. 357,] *Haddon* v. *Crawford* (1912), 49 Ind. App. 551, 97 N. E. 811; *Brock* v. *State, ex rel.* (1882), 85 Ind. 397; *Bailey* v. *Boyd* (1877), 59 Ind. 292; *Harvey* v. *Ball* (1869), 32 Ind. 98; *Latshaw* v. *State, ex rel.* (1901), 156 Ind. 194, 199, 59 N. E. 471; *Binns* v. *Dazey* (1897), 147 Ind. 536, 44 N. E. 644. . . ."

Again in *Thacker* v. *Butler* (1962), 134 Ind. App. 376, 184 N. E. 2d 894, we made it clear that the acknowledged illegitimate-child-statute (§ 6-2309 [Burns 1933] quoted *ante*) was not a legitimation statute and conferred only an expectancy of inheritance (by the acknowledgment) which could be, and was abrogated by the Probate Code § 207 (quoted *ante*) which now requires, instead of mere acknowledgment, that "paternity . . . has been established by law, during the father's lifetime."

It is to be noted that this one section of the Probate Code, § 207, not only makes provision for those illegitimates who would have been "deemed legitimate" under the 1852 statute, (i.e., the ones whose parents marry) but also provides for that other class of illegitimates who were given inheritance rights, but not legitimacy, by the other pre-Code statutes last above quoted (Burns 1933 § 6-2309).[13] Under the above quoted § 207 of the Probate Code each of those classes of illegitimates is to "be treated the same as if he were the legitimate child of his . . . [mother or father as the case may be]." The child whose putative father marries his mother is treated no differently as to legitimacy than is any other class of illegitimates mentioned. His relationship to his "putative

13. See *Thacker* v. *Butler, supra,* (134 Ind. App. 376) and *Wilson* v. *Bass, supra,* (70 Ind. App. 116) discussed above.

father" is no different than the illegitimate whose putative father has not married his mother (if that putative father's "paternity . . . has been established by law, during the father's lifetime"). From the four corners of the statute itself, there is as much reason (i.e., none at all) to say that all illegitimates are the legitimate children of their mother and that all children born paternally illegitimate are legitimated to the father when "the paternity of such child has been established", as there is to say that "if the putative father . . . marries the mother and acknowledges the child to be his own", the child is the legitimate child of the acknowledging father.

We can see no reason why there should not be such a law, but, of course, that is not the question. Our concern is whether section 207 of the Probate Code *is* such a law. Obviously it is not. It simply does not contain words which say that illegitimates shall be deemed legitimate. It merely specifies the conditions for "inheritance to, through and from an illegitimate child."

We are not here involved with the terms of some privately drawn instrument which might, in a proper action, be amenable to judicial reformation to include something omitted as the result of a scrivener's mistake or the mutual mistake of the contracting parties. If we assume, as may well be the case, that the 1953 Legislature did not really intend to discard the more lenient civil rule of legitimation and return to the harsher common law rule of non-legitimation, we must bear in mind that such legislative oversights can rarely be rectified by any human agency save the legislature itself. While courts, including this intermediate appellate court, can *and* do correct errors in judge made law of long standing,[14] nevertheless, "where the language of en-

---

14. E.g., *Brinkman* v. *City of Indianapolis* (1967), 141 Ind. App. 662, 231 N. E. 2d 169; *Klepinger* v. *Board of Commissioners of County of Miami* (1968), 143 Ind. App. 155, 239 N. E. 2d 160. "The principle of stare decisis does not demand that we follow precedents which shipwreck justice!" *Harris* v. *Y.W.C.A.* (1968), 250 Ind. 491, 237 N. E. 2d 242, 244, quoting *Flagiello* v. *Pennsylvania Hospital* (1965), 417 Pa. 486, 208

actments is free from ambiguity and uncertainty, courts cannot supply defects or omissions in order to carry out more fully the supposed purpose and intent of the legislature."[15] It is only where there is a gross error apparent on the face of the act that the courts will correct it by construing the statute to give effect to the obvious intent of the legislature.[16]

No words in the Probate Code suggest that the Legislature which enacted it did not intend to repeal the 1852 statute and to substitute for it the different provisions of section 207. In so doing, of course, it was relying on the report of the Probate Study Commission. Professor Grimes, in his 1954 edition of Henry's PROBATE LAW, Vol. II, p. 1400, after quoting the new Probate Code's § 207, makes these comments:

"Since this speaks of inheritance purposes only,[71] it may be questioned whether this language is as broad for purposes of legitimation as the former statute. The issue is pertinent in determining whether the legitimated child is now liable for support of the parent,[72] or the parent of

A. 2d 193. See Judge Sharp's dissent, *Troue* v. *Marker* (1969), 145 Ind. App. 111, 249 N. E. 2d 512, 516, 18 Ind. Dec. 200, superceded by *Troue* v. *Marker* (1969), 253 Ind. 284, 252 N. E. 2d 800, 19 Ind. Dec. 592.

15. *Taylor* v. *State* (1907), 168 Ind. 294, 297, 80 N. E. 849.

16. *Kos* v. *State, ex rel* (1941), 218 Ind. 115, 121, 31 N. E. 2d 50: "[C]ourts may provide minor omissions or make minor substitutions in the enactments of the legislature where (1) such action is necessary in order to give vitality to or prevent absolute absurdity in the acts of the legislature; (2) an omission has occurred or a correction is necessary because of a clerical or typographical error; (3) the legislation, as enacted, was obviously not within the comprehension of the legislative body, and (4) the legislative intention, with respect to the enactment, is clear." *Woerner* v. *City of Indianapolis* (1961), 242 Ind. 253, 264, 177 N. E. 2d 34.

17. Notes by author of quoted text:

"71 See *Wilson* v. *Bass*, 70 Ind. App. 116, 118 N. E. 379, to the effect that such a statute refers only to inheritance, and does not make the child legitimate for other purposes.

"It was held in Pennsylvania that statutes of legitimation can have no force as affecting land outside of the state of their enactment, so as to enable one to take by inheritance in another state where the law of that state would not permit such inheritance. *Smith* v. *Derr*, 34 Pa. 126, 75 Am. Dec. 461.

"This principle of law is also recognized in other states. *Lingen* v. *Lingen*, 45 Ala. 410; *Stoltz* v. *Doering*, 112 Ill. 234; *Barnum* v. *Barnum*, 42 Md. 251.

"72 Burns' Stat., §§ 10-1410—10-1411.

the child,[73] or whether, for purposes of statutory allowances to children,[74] the legitimated child is classed as legitimate. It is believed, however, that the statute will be liberally construed, and it is doubtful whether the legislature intended at any event to lower the status of a child which had become legitimated prior to January 1, 1954.

"Certainly, the legislature could not, constitutionally, bastardize a child which had, prior to January 1, 1954, become legitimate for all purposes under the law because of the marriage of its parents.[75]

"It was the apparent intent of the Probate Study Commission to reduce illegitimacy to a problem of proof of parentage. The statement is found in the commission's explanation: 'We have abolished the bar sinister.'[76] In attempting to accomplish this result, however, reliance was had on the format of the Model Probate Code, which approached the matter only from the standpoint of probate law, thus covering only two of the four segments of the problem: (a) descent, and (b) wills. Thus left untouched were the questions: (c) of inter vivos instruments, and (d) statutes relating to offspring generally. The common law concept of nullius filius applies to these last two phases of the law, so that an illegitimate does not come within the description of offspring in an inter vivos instrument.[77] . . . ."[17]

---

"73 Burns' Stat., §§ 10-1402—10-1409. *Small* v. *State*, 226 Ind. 38, 77 N. E. (2d) 578.

"74 Social Security. F. C. A. 42 § 402; Railroad retirement death benefits, F. C. A. 45 § 208e.
"The legitimated child was entitled to any legal compensation for death of her father. *In re Marshall*, 117 Ind. App. 203, 70 N. E. (2d) 772.

"75 So as to vested rights, *Gregley* v. *Jackson*, 38 Ark. 487; *McGunnigle* v. *McKee*, 77 Pa. 81, 18 Am. Rep. 428, but, of course, descent is not a vested right. Nor does a statute charging legitimation for descent purposes affect cases where the descent is cast by death of the ancestor prior to January 1, 1954. *Garland* v. *Harrison*, 8 Leigh (Va.) 368; and see *Pfeifer* v. *Wright*, 41 Fed. (2d) 464, 73 A. L. R. 932.

"76 Probate Study Commission Report Part II.

"77 See Simes on Future Interest, vol. II, § 415."
The 1970 Cumulative Supplement to the above quoted text concedes that the Probate Code has abolished legitimation by marriage and acknowledgment after birth, but fervently pleads for the courts to restore it. Neither the original text nor the supplement suggests what specific rule of "liberal interpretation" or construction might authorize us to amend § 207 to restore the legitimation statute it repealed without our thereby usurping the power to legislate, which is entrusted by our state Constitution to the General Assembly and the Governor. Ind. Const. Art. 3, § 1; Art. 4, § 1, Art. 5, §§ 13, 14.

We conclude that under the law of Indiana as it presently exists, and has existed since January 1, 1954, well prior to the conception and birth of the child in question, there is no substantive legal basis on which any court could declare that the child in question is the legitimate child of the plaintiff.[18]

---

The supplement also asks whether the provisions of Ind. Ann. Stat. § 44-109 (Burns 1965) "enable a court to determine the paternity of a child under Burns' Stat., § 6-207 as well as his legitimacy so as to enable the child to inherit under Burns' Stat., § 6-201", suggesting that if it does "then much of the problem raised by Burns' Stat., § 6-207 (b) can be solved." The basic fallacy in that wishful thinking is that the statute (§ 44-109) purports merely to authorize judicial action by the court, i.e., the entry of a declaratory judgment. Legislative power is not, and could not be, granted to courts. Ind. Const. Art. 3.

18. In reaching this conclusion we are not unmindful that in *Miller* v. *Miller* (1967), 142 Ind. App. 90, 104, 231 N. E. 2d 828, 836, in an opinion concurred in only by the judge who wrote it (although all judges concurred in the result), sub-section (b) of section 207 of the Probate Code is quoted and followed by this statement:

"This sub-section (b) *states* that a child may be legitimated by the putative father entering into the marriage relation with the mother when she had borne a child out of wedlock, and the putative father and husband hence acknowledges the said child as his own." (Emphasis added.)

It is obvious that the statute does *not* so *state*. If the judge meant to say that its meaning and effect is the same as though it had so "stated", he failed to set forth the reasons which lead him to that conclusion. We are at a loss to supply them.

Additionally we acknowledge *dicta* in *Profitt* v. *Profitt* (1965), 137 Ind. App. 6, 9, 204 N. E. 2d 660, 4 Ind. Dec. 638, as follows:

"Appellee contends that the controlling law in Indiana is such that when the parents of illegitimate children marry, the children become for all purposes legitimate. We agree with this statement of the law, but we fail to see a connection between appellee's authorities and the case at bar."

The rationale of our decision in that case was that there was no basis for the trial court's finding "that two children born in 1957, and 1958, respectively, during the existence of a prior valid marriage, were born as a result of a marriage not entered into until September 26, 1959." (Id. at 10). Thus the judge who wrote that opinion had no reason to investigate whether "appellee's authorities" were based on 1 R. S. 1852, Ch. 27, § 9 or on § 207 of the 1953 Probate Code.

We also note that West's INDIANA LAW ENCYCLOPEDIA contains a section (5 I. L. E. *Children Born Out of Wedlock* § 3) which states that "[a]child born out of wedlock will be deemed to be legitimate if either the paternity of such child has been established by law during the father's lifetime or if the putative father marries the mother of the child and acknowledges the child to be his own." The only authority cited is simply "Burns' Ann. St. § 6-207". Other sentences in that section which elaborate on that theme are documented by foot-

Notwithstanding the fact that plaintiff can never, under existing law, attain the status of legitimate father of the child, it is theoretically possible that he may, nevertheless, have "standing" to bring a declaratory judgment action, with proper parties joined, seeking to be declared the biological father of the child. Before exploring whether public policy denies him standing, we examine his "interest". We take that approach in recognition of the general principle which is the basis of our real-party-in-interest rule[19], the rule that one must have "a substantial present interest in the relief sought" to authorize him to invoke the judicial process.[20]

What, then, are the "rights", if any, of the father with respect to an illegitimate he has sired?

As late as 1955, it was, as it had been "from time immemorial", the law of England that the father of an illegitimate has no rights with regard to such child.[21] And that was also

note citation of Indiana cases decided prior to the adoption of the Probate Code, but no mention is made of the statutes under which they were decided.

Lastly we note that Judge Wickens, in *Witt* v. *Schultz* (1966), 139 Ind. 142, 143, 217 N. E. 2d 163, 164, 8 Ind. Dec. 500, has accurately characterized the effect of section 207(b) of the Probate Code, by saying: "Two statutory means by which this petitioner may be entitled to be treated as a legitimate child of the father *for purposes of inheritance only*, are contained in the Indiana Probate Code." (Emphasis added.)

19. Trial Rule 17(A).

20. *Zoercher* v. *Agler* (1930), 202 Ind. 214, 221, 172 N. E. 186, 907; § 2, Uniform Declaratory Judgment Act (Ind. Ann. Stat. § 3-1102 [Burns 1968], IC 1971, 34-4-10-2).

21. *Re M., an Infant*, (English Court of Appeal, 1955), 2 Q.B. 479, 3 Week L.R. 320, 51 A. L. R. 2d 488, 490.

Blackstone speaks of "the duty of parents to their bastard children", but makes no express mention of rights. However, he parenthetically negated parental rights by saying that "bastards are not looked upon as children to any civil purposes."

The only duty he mentions is maintenance, describing the method by which it is provided (pursuant to Stat. 18 Eliz. c. 3. 7 Jac. I c. 4, 3 Car. I. c. 4. 13 and 14 Car. II c. 12. 7 Geo. II, c. 31.) in words which read as though he were describing Indiana's pre-1942 bastardy statute (2 R. S. 1852, Ch. 3, as last amended by Acts 1935, ch. 168), apparently considered a criminal proceeding. He also mentions "that a man shall not marry his bastard sister or daughter". I COMMENTARIES 458.

the law of Indiana until 1954 when the Probate Code made the illegitimate father whose paternity had been established (judicially or by marriage and acknowledgment and during his lifetime) an heir apparent of the child.[22] So long as the child and the father are both living the interest of either in the estate of the other as heir apparent is a mere expectancy, both practically and legally. Not only may either pre-decease the other, die unpossessed of a solvent estate, or leave a valid will disinheriting the other, but the law may be changed. An heir apparent's expectancy becomes a vested right only on the death of the person to whom he is potentially an heir, if ever it vests.[23] Nor is it suggested in the record, briefs, or oral argument that any pecuniary or material advantage will immediately accrue to plaintiff by virtue of being declared

---

22. The statute, § 207(b) of the Probate Code is quoted *supra*, p. 540. The statement in 5 I. L. E. *Children Born out of Wedlock* § 5, p. 148, that the father of a deceased intestate illegitimate child "can inherit from him in the same way as if he were legimate" is wholly incorrect, with respect to Indiana law both before and since the effective date (January 1, 1954) of the Probate Code. The authority cited, *Cahall* v. *Hines* (1950), 120 Ind. App. 113, 116, 90 N. E. 2d 507, held that "[t]he child having been legitimized, certainly the father can inherit from it in the same manner he would inherit from a child born in wedlock." The only inference logically to be drawn from that case with respect to whether father of a deceased intestate illegitimate can be his child's heir is that he cannot.

"Our statutes do not confer upon the putative father of a bastard the right to inherit from him, even though he may have acknowledged such child as his own. . . ." *L. T. Dickason Coal Co.* v. *Liddil* (1911), 49 Ind. App. 40, 45, 94 N. E. 411. See also 2 Henry's PROBATE LAW *Descent* § 11, p. 1404; *Ellis* v. *Hatfield* (1863), 20 Ind. 101, 102.

A statute replaced by the Probate Code, 1 R. S. 1852, Ch. 27, § 10, (Ind. Ann. Stat. § 6-2311 [Burns 1933]) provided:

"The mother of an illegitimate child dying intestate, without issue or other descendants, shall inherit his estate; and if such mother be dead, her descendants or collateral kindred shall take the inheritance in the order hereinbefore prescribed."

Which obviously left no room for inheritance by the natural father nor have we found any pre-Probate Code statute which purported to confer any such right on him.

23. *Donaldson* v. *State* (1913), 182 Ind. 615, 628, 101 N. E. 485. Our brief statement of the merely expectant (thus insubstantial) nature of the "right" of the heir apparent is not intended to be complete or definitive and may even be technically inaccurate in aspects not here pertinent. Readers seeking authority or instructions are directed to Henry's PROBATE LAW (6th Ed. 1954, and current Cum. Supp.) *Descent* § 24, p. 1341. See also *Thacker* v. *Butler* (1962), 134 Ind. App. 376, 184 N. E. 2d 894.

the natural father of the child, such as, for instance, a beneficial interest in some trust estate or future interest in real property. We conclude, nevertheless, the expectancy as an heir apparent is a present interest sufficient to give plaintiff standing to maintain this action (provided public policy, considered *post*, permits).

There are several other considerations which lead us to the conclusion that a putative father of an illegitimate has a sufficient interest, by reason of being potentially an heir, to enable him to maintain an action during the child's living infancy to have his paternity judicially declared, even though the practical possibility of realized pecuniary benefit may appear extremely remote. Foremost is the condition contained in the descent statute itself that if paternity alone is relied upon it must be "established by law during the father's lifetime"[24] and the additional qualification that

> "[t]he testimony of the mother may be received in evidence to establish such paternity and *acknowledgment* but no judgment shall be made upon the evidence of the mother alone. The evidence of the mother must be supported by corroborative evidence or circumstances."

While it does not appear that when the father has married the mother there is any requirement that the marriage and acknowledgment be proved during the father's (or child's) lifetime, still it may be highly advantageous to do so while proof is available.[25] The Probate Code does not specify in

---

24. Ind. Ann. Stat. § 6-207 (Burns 1953).

25. It is interesting here to note that as early as 1873, when the Legislature provided that the issue of certain void marriages should "be deemed legitimate" it recognized the need for early adjudication *via* declaratory judgment (albeit not then so called) when it provided by Ind. Ann. Stat. § 44-109 (Burns 1965), IC 1971, 31-1-7-4:

*"For the purpose of evidence,* any person or persons interested in the question of such legitimacy may file their petition in the circuit court or common pleas or superior court of any county in this state, where either of the parties to said marriage may reside, setting forth the facts, and making defendants thereto all persons interested in such question, and give such notice to said defendants as is by this act required to be given to the defendant on a petition for a divorce; and the court, on hearing such petition, shall decree such issue to be legitimate or illegitimate, as the facts may be. And from such decree,

the type of court action by which paternity or acknowledgment can be or should be established in order to create heirship "to, through and from an illegitimate child". Absent the requirement for determination of paternity during the lifetime of the putative father, it might be assumed that proof of heirship pending administration of a decedent's estate pursuant to Ind. Ann. Stat. § 6-606 (Burns 1953), or, in the absence of administration or probate of a will within one year of death, under § 7-1115 would suffice. But since establishment during the father's lifetime is required, and the only *expressly* provided procedure for establishing illegitimate paternity is the so-called Children Born out of Wedlock Act of 1941,[26] by which an illegitimate father's obligation to support his child can be established and enforced on the mother's petition, it has sometimes been assumed that that act provides the exclusive procedure for establishing paternity for heirship. That notion also finds support in the fact that juvenile courts are not known to have ever entertained jurisdiction of declaratory judgment actions[27] but they do have exclusive jurisdiction of

an appeal may be taken to the Supreme Court, and when taken, the case shall be governed by the same rules and disposed of as other civil actions are in cases of appeal." (Source: Acts 1873, c. 43, s. 4). (Emphasis added.)

26. Ind. Ann. Stat. § 3-623, *et seq.* (Burns 1968), IC 1971, 31-4-1-1, *et seq.*

27. Sec. 1 of the Uniform Declaratory Judgments Act, Ind. Ann. Stat. § 3-1101, also IC 1971, 34-4-10-1, provides that "[c]*ourts of record* within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. . . ." So far as we can determine no reported Declaratory Judgment action has originated in any court other than one clearly of general original jurisdiction, sometimes called courts of superior original jurisdiction (i.e., Circuit, Superior, and Probate Courts). Nor has any published opinion attempted to define "courts of record" as used in this Act. Prominent members of the Indiana bar, Galitzen A. Farabaugh and Walter R. Arnold, both of South Bend, wrote a commentary on the act published in 3 Ind. L. J. 351, 360 (1928), in which they expressed the belief that the Legislature intended to confer declaratory jurisdiction only on courts of superior jurisdiction but by the unfortunate circumstance of having adopted a uniform act without proper scrutiny for phrases irrelevant to Indiana usage had actually conferred jurisdiction on Justices of the Peace to render declaratory judgments, citing *Hooker* v. *State ex rel. Haynes,* 7 Blkf. 272; *Pressler* v. *Turner,* 57 Ind. 56; *Larr* v. *State,* 45 Ind. 364; *Fitch* v. *Byall,* 149 Ind. 554; *Brackney* v. *State,* 182 Ind. 343 (344), all of

paternity-support actions by virtue of Ind. Ann. Stat. § 9-3103 (Burns 1971), IC 1971, 33-12-2-3, which provides that "[t]he juvenile court shall also have exclusive original jurisdiction to determine the paternity of any child born out of wedlock, and to provide for the support and disposition of such child. . . ."[28] While the question of jurisdiction cannot arise here, because both courts below[29] have juvenile jurisdiction, as well as all other general original jurisdiction (including probate jurisdiction), yet the question of procedure and parties cannot be ignored.

Although an adjudication of paternity made by a court exercising juvenile jurisdiction in an action under the born-out-of-wedlock act above cited may be sufficient to satisfy the requirements of § 207 of the Probate Code, provided the proof meets the § 207 requirements, we see no reason that it should be the exclusive avenue to such

---

which hold that justice courts are courts of record. "A Court that is bound to keep a record of its proceedings, and that may fine or imprison, is a court of record. 3 Blacks. Comm., 24." *Hooker* v. *State*, *supra* at 273. As *Hooker* said of a Justice's Court, a Juvenile Court "is within that definition". (But see Gavit, *The Jurisdiction of Courts*, 3 Ind. L. J. 324, 340, n. 29, 341, nn. 32, 33.)

28. A similar New York statute confers such exclusive jurisdiction on the "family court." A putative father was successful in his action to have himself declared the father of a child born to a married woman. *Matter of Crane* v. *Battle* (Fam. Ct. N. Y. Co. 1970), 62 Misc. 2d 137, 307 N. Y. S. 2d 355. Eight months later another Family Court judge held that "the 'manner provided by law' for the establishment of paternity does not permit the putative father to originate the proceeding." *Roe* v. *Roe* (Fam. Ct. Kings Co. 1970), 65 Misc. 2d 335, 316 N. Y. S. 2d 94, 95. *Roe* pointed out that the father had a remedy by way of declaratory judgment in New York's court of general original jurisdiction, the Supreme Court. *Matter of Melis* v. *Dept. of Health* (1940), 260 App. Div. 772, 24 N. Y. S. 2d 51. New York's intestate succession law, E. P. T. L. § 4-1.2, quoted *post*, n. 32, created rights between illegitimate children and their fathers "if a court of competent jurisdiction has, during the lifetime of the father, made an order of filiatius declaring paternity in a proceeding instituted during . . . pregnancy . . . or within two years from the birth. . . ." (See n. 32, *post*.)

See also *Profitt* v. *Profitt* (1965), 137 Ind. App. 6, 10, 204 N. E. 2d 660, 661, 4 Ind. Dec. 638, 641. (also cited *ante*, n. 18.)

29. The case was filed in the Pulaski Circuit Court and the venue changed to Starke County which also has no other court with juvenile jurisdiction. The trial court in stating that "plaintiff has no . . . jurisdiction to bring this action" probably used "jurisdiction" to signify "capacity".

an adjudication. Its procedures are open only to the mother (if living and competent),[30] or to the jointly petitioning mother *and* father[31] thus leaving the real parties in interest under § 207 (b) (i.e., the child and the father) without remedy if no other procedure is open to them. We see no reason for holding that illegitimate paternity is not a "legal relationship affected by a statute" (i.e., Probate Code § 207) for the purpose of making an illegitimate father or child an interested party under section 2 of the Declaratory Judgment Act.[32]

---

30. Ind. Ann. Stat. § 3-631 (Burns 1968).

31. Id., § 3-630. (When they agree).

32. Ind. Ann. Stat. § 3-1102 (Burns 1968), IC 1971, 34-4-10-2. Our suggestion that a paternity adjudication under the born-out-of-wedlock statute (Ind. Ann. Stat. § 3-623, *et seq.* [Burns 1968]) *may* be a sufficient determination to establish heirship (if the mother's testimony is corroborated), does not mean that we believe it is sufficient. We incline to the views expressed by the Court of Appeals of New York in *Commissioner, etc.* v. *Koehler* (1940), 284 N. Y. 260, 30 N. E. 2d 587, 590, as to the limited and nonbinding effect of the ordinary paternity-support adjudication:

"Paternity proceedings are brought to enforce a statutory duty imposed upon the father of a natural child to whom the father at common law owed no duty. *People ex rel. Lawton* v. *Snell*, 216 N. Y. 527, 111 N. E. 50, Ann. Cas. 1917D, 222. Such a proceeding may be brought by the mother or if the child "is or is likely to become a public charge" by a public official. Inferior Criminal Courts Act, § 64, subd. 1. The child is not a necessary party to the proceedings nor is the husband of the mother. The order made in such a proceeding does not constitute an adjudication binding on them or persons claiming through or under them that the child is or is not the legitimate offspring of married parents. An order adjudging that some person other than the mother's husband is the father of the child and ordering him to provide for its support is, it is plain, not a binding adjudication of illegitimacy. It does not establish the status of the child nor would it be competent evidence to establish illegitimacy in any proceeding to which others are parties."

At that time (1940) there were no inheritance rights between an illegitimate father and child. *Saks* v. *Saks* (1947), 189 Misc. 667, 71 N. Y. S. 2d 797. L. 1966, c. 952, amended by L. 1967, c. 686, cited as E. P. T. L. § 4-1.2 (i.e., Estates, Powers and Trusts Law § 4-1.2 now provides:

"(a) For the purposes of this article:
* * *

"(2) An illegitimate child is the legitimate child of his father so that he and his issue inherit from his father if a court of competent jurisdiction has, during the lifetime of the father, made an order of filiation declaring paternity in a proceeding instituted during the pregnancy of the mother or within two years from the birth of the child.
* * *

"(b) If an illegitimate child dies, his surviving spouse, issue, mother, maternal kindred and father inherit and are entitled to letters of administration as if the decedent were legitimate, provided that the father may inherit or obtain such letters only if an order of filiation has been made in accordance with the provisions of subparagraph (2)." L. 1966, c. 952, amended L. 1967, c. 686, §§ 28, 29, eff. Sept. 1, 1967.

\* \* \*

*Pursley* v. *Hisch* (1949), 119 Ind. App. 232, 85 N. E. 2d 270, of course antedated the Probate Code. At first blush it seems to suggest that a paternity adjudication in an action under the children-born-out-of-wedlock statute by a married woman would affect the status of the child, but it never actually speaks of the presumption of legitimacy, only of the presumption of the husband's paternity, and concludes:

"*In a proceeding of this kind* we think the presumption or inference, although it is one of the strongest known to the law, is susceptible of being rebutted. See *Roth* v. *Jacobs* (1871), 21 Ohio St. Rep. 646." (Emphasis added.) (119 Ind. App. at 237).

Different judges of the Family Court, City of New York, have given opposite answers to the question of whether a putative father can maintain an action under New York's equivalent of our children-born-out-of-wedlock act. In *Matter of Crane* v. *Battle* (Fam. Ct. N. Y. Co. 1970), 62 Misc. 2d 137, 307 N. Y. S. 2d 355, it was held that he could maintain the action, based largely on the premise that it would be unconstitutional to deny plaintiff "[e]qual access to the laws . . . solely because he is a male." (The mother was married at all times [though informally separated], but nothing was said about plaintiff's standing other than the language of the statute authorizing the action which mentions the putative father only as a respondent.)

Eight months later in *Roe* v. *Roe* (Fam. Ct. Kings Co. 1970), 65 Misc. 2d 335, 316 N. Y. S. 2d 94, the contrary result was reached. There the child was born to the mother while married to one other than the petitioning putative father. After the birth the mother divorced her husband and married petitioner. Again apparently solely on the wording of the statute, it was held the father had no standing, pointing out that he was not "deprived of access to the laws" because he had a remedy under the declaratory judgment act, citing *Matter of Mellis* v. *Dept. of Health* (1940), 260 App. Div. 772, 24 N. Y. S. 2d 51 (cited herein *ante*, p. —).

*Roe* also quoted *Comm.* v. *Koehler, supra*, and suggests:

"The implications of the Koehler case as regards E. P. T. L. 4-1.2 [quoted *supra*, this opinion] are interesting to contemplate. If, for example, this putative father were permitted to originate this proceeding and an order of filiation were made which was not binding on the child or the first husband of the mother, could the child thereafter claim the right of inheritance from both and conversely, could the petitioner and the first husband of the respondent both claim the right to inherit from the child?"

The establishment of paternity in Indiana in an action under the children-born-out-of-wedlock act, even when the mother's testimony is properly corroborated, poses like questions with regard to inheritance rights under Probate Code § 207, Ind. Ann. Stat. § 6-207, quoted *ante*, p. —.

Since the New York decisions in both the *Crane* and *Roe* cases, the United States Supreme Court has invalidated an Idaho statute which

If plaintiff had no standing to bring a declaratory judgment action it is not from want of interest. It may be, however, as the trial judge stated, "that it would be against public policy to permit [him to bring] such an action." We can think of no possible public policy which would be transgressed by permitting any man to attempt to establish his paternity of a child born to an *un*married woman and never thereafter legitimatized for any purpose by any method. But other considerations certainly enter the scene when the child has been born to a married woman. Whatever public policy the trial judge had in mind related, we feel certain, to the presumption of legitimacy of a child born to a married woman. Plaintiff's "standing" then may depend not on his "interest" (which we believe has been shown) but on whether the public policy of the State of Indiana permits a man to dispute the presumed legitimacy of a child born to a married woman merely in order to establish an illegitimate father-son relationship for inheritance purposes.

In a few jurisdictions there is a narrow limitation imposed by statute or precedent on the classes of persons who may dispute the presumption of legitimacy. It ranges from the strict rule barring all but the husband[33] to the more liberal rule

---

provided that "males must be preferred to females" when several persons seeking letters of administration were otherwise equally entitled. *Reed* v. *Reed* (Nov. 22, 1971), 404 U. S. 71, 92 S. Ct. 251, 30 L. ed 2d 225, reversing 93 Idaho 511, 465 P. 2d 635. The decision clearly does not invalidate all discrimination between sexes.

"The question presented by this case, then, is whether a difference in the sex of competing applicants for letters of administration bears a rational relationship to a state objective that is sought to be advanced by the operation of §§ 15-312 and 15-314."

The exclusion of putative fathers as sole plaintiffs under the children-born-out-of-wedlock act may well bear "a rational relationship to . . . [the] state objective . . . sought to be advanced by . . . [the act]." Especially if declaratory judgment is held to be a proper procedure for establishing paternity for inheritance purposes.

33. Florida seems to be the only state where that is clearly the rule. *Gossett* v. *Ullendorff* (1934), 114 Fla. 159, 154 So. 177; *Kowalski* v. *Wojtkowski* (1955), 19 N. J. 247, 116 A. 2d 6, 53 A. L. R. 2d 556, though it may apply in Illinois, Iowa, and Texas. See Anno. 53 A. L. R. 2d at 580.

barring all but the husband, mother and their descends[34], to the extreme liberality of imposing no limitation at all (except interest).[35] Like most jurisdictions Indiana has never spoken directly to that question in any reported decision. But of course Indiana, as is true of most states, has never been confronted with a self-proclaimed adulterer as the would-be bastardizer.[36] However, in the few instances coming to our attention in which an adulterer has sought a declaration of his illegitimate paternity of a child presumptively the legitimate child of another man, there has been no mention of the possibility of any public policy which would bar him. On the contrary, in the first case, the judge said of the adulterer who had lived with the child's mother as husband and wife, but had never married her, (although the first husband had divorced her after the child's birth):

> "There is no doubt, from the papers before me, that the petitioner is acting in good faith, and I think that he is to be commended for the frank recognition of his responsibilities. However, while *I am sympathetic to the petitioner's plea,* I cannot grant it on the present state of the record...." (Emphasis added.)[37]

34. That is the statutory rule in California. *Serway* v. *Galentine* (1946), 75 Cal. App. 2d 86, 170 P. 2d 32. See n. 2, *ante.* See also Anno. 53 A. L. R. 2d at 574.

35. In *Kreighbaum* v. *Dinsmore* (1929), 88 Ind. App. 693, 696, 165 N. E. 526, a seduction case, we did say, probably as *obiter dictum*, that "when Esther Dinsmore married Harry Dinsmore and at said time was pregnant, they are both precluded from denying their parentage of that child". But in *Pursley* v. *Hisch* (1949), 119 Ind. App. 232, 85 N. E. 2d 270, in permitting a married woman to bring a paternity-support action against one not her husband involving a child born one month after marriage we virtually repudiated *Kreighbaum* as well as a like holding in *Phillips* v. *State* (1925), 82 Ind. App. 356, 145 N. E. 895. Those cases, however, involved what amounted to an estoppel arising out of the marriage with knowledge of pregnancy, not an arbitrary incapacity to dispute the presumption arising from birth during marriage.

36. While the allegations of plaintiff's complaint render him a self-proclaimed adulterer, he has so far indicated no desire to destroy the child's social or legal status of legitimacy and may not pursue this action further if our decision that such would be the effect of his establishing his paternity acquires finality. We cannot, as the record now stands, label him "a would-be bastardizer."

37. *Matter of P.* v. *Department of Health, etc.* (1951), 200 Misc. 1090, 107 N. Y. S. 2d 586, 588. The decision and opinion is by a single judge of a trial court (the New York Supreme Court, Trial Term),

But the judge also had this to say (which he repeated in his second opinion fifteen years later) :

"Moreover, as I suggested on the argument, the impact of my decision on the infant may be quite serious—and in my view, the infant should be directly represented in a proceeding such as this, where the granting of the petitioner's application would mean that (however undesired or unjust so far as the infant is concerned) he will forever be subject to the psychological hazard if not the public handicap of illegitimacy. I am not unmindful that in history's pages there is recorded the fact that some children born out of wedlock—whether as a result of momentary passion, incidental indiscretion or lasting love—have in later life made their marks as great men and women. I know, too, that more and more have statutory enactments properly sought to break down the unfair barriers created by earlier concepts in these matters. Nor am I unaware of certain current thinking that legitimacy or bastardy is a natal status of no moment in these days of social development and advanced understanding. For myself, however, I am not sure that centuries of tradition and morality and law can juridically be so easily deprecated. I am not warranted in ignoring the child's right to be represented or heard in a proceeding which may have a lasting bearing on the determination of his parentage. Be that as it may, even from the point of view of property and of practicality, an infant of the age of six, as a ward of the court, is entitled to direct professional representation. Suppose the husband has a substantial estate—should there even be any tangential determination by this court that the husband is not the father of the child—and thus render it more difficult, if not impossible, for the infant in later life to obtain a possible just inheritance" In [Matter of] *Melis* v. *Department of Health, of City of New York,* 260 App. Div. 772, 775, 24 N. Y. S. 2d 51, 55, the court indicated that in a suit for a declaratory judgment, 'the infant, whose rights

Mr. Justice Matthew M. Levy, who also wrote the second opinion (also as a trial judge) in *Roe* v. *Roe* (1966), 49 Misc. 2d 1070, 269 N. Y. S. 2d 40. These two opinions have been approvingly noted by a five judge panel of the Appellate Division of the New York Supreme Court in *C.* v. *Ingraham* (1969), 31 A. D. 2d 429, 298 N. Y. S. 2d 545, 548, in advising petitioners (whose relationship to the child, to each other, and to the presumptively legitimate father was precisely that of plaintiff and his wife—except that New York has a legitimation statute) to make "application to a court to adjudicate or change the status of the child, wherein notice may be given to the presumptive father, and a guardian ad litem be appointed to protect the interests of the child. . . ."

are paramount, should be made a party in the manner provided by law (§ 225 Civil Practice Act) and a guardian *ad litem* appointed to protect its interests. (Citing cases).' I think that without question the same procedure should be followed here."[38] 107 N. Y. S. 2d at 591, quoted in **269 N. Y. S. 2d at 46.**)

Like sentiments have recently been expressed by the Supreme Court of our state in a divorce case, *Buchanan* v. *Buchanan* (1971), 256 Ind. 119, 123, 267 N. E. 2d 155, 157, 24 Ind. Dec. 719, 721, in which the husband (with some aid from the mother) unsuccessfully sought to have a child born seven months after marriage declared *not* his child.

"It is to be noted that the child has an interest here, and, although it was not a party to this action nor was it represented by counsel before the trial court, that court cannot, as an organ of the State, stand idly by and allow the parties before it to destroy that interest without clear and convincing proof."

*Buchanan* implies that a child's status of legitimacy is a valuable interest not lightly to be toyed with, but that such status may well be in the balance, if the husband and wife attempt to litigate paternity in the divorce action, and that it should not be "destroyed" without affording adequate protection to the child's interest. All of which brings us to the questions of 1) parties and 2) estoppel. The first will be deferred until the second has been considered.

Defendant contends that plaintiff is estopped by what he considers to be the adjudication of the child's paternity in the divorce action between plaintiff's present wife and the defendant. The parts of the final entry in the divorce case pertinent to that contention are:

"The Court finds that there was born as the issue of this marriage [*the child's name*], born July 20th, 1966.

---

38. In *Roe* v. *Roe, supra,* 269 N. Y. S. 2d at 48; Justice Levy said: "If the parties are financially unable to meet the expense . . . [of a special guardian to protect the interests of the child], I shall endeavor to invoke the good offices of the Legal Aid Society."

"That this plaintiff is entitled to custody of the minor child and plaintiff is to get the sum of $15.00 per week for the support of said child. The first payment will be made on or before October 28, 1967 and a like amount each successive week. All payments to be made to the Pulaski Circuit Court for the use and payment thereof. Defendant is granted reasonable visitation of the minor child of the parties.

\* \* \*

"IT IS THEREFORE, ORDERED, ADJUDGED AND DE-CREED that the plaintiff have an absolute divorce from the defendant, and that the court agrees and directs that the property settlement agreement entered into by and between the parties is approved and is binding upon the parties thereto."

\* \* \*

Neither the pleadings in the divorce action nor the property settlement agreement are shown in the record of this case. Defendant does not contend that plaintiff was a formal party to the divorce or even that he took any part in the litigation, or had any right so to do, which might have bound him as though he were a party.[39] Defendant contends that plaintiff is bound by the divorce entry finding[40] because he has accepted the benefits of the divorce by marrying defendant's ex-wife and is now "able to enjoy the incidental benefit that his present wife was given custody of the child." He does not use the word privy or privity but it seems to be his thesis that the "acceptance of benefits" made plaintiff his wife's privy as to the divorce decree and all its incidents.

In support of his estoppel argument defendant cites only two authorities: *Attebery* v. *Attebery* (1961), 172 Neb. 671, 111 N. W. 2d 553, which involved only *a party to the divorce* (not a third-person-non-party) who was estopped to question the validity of the divorce itself because (among other rea-

---

39. *Indiana Insurance Co.* v. *Noble* (1970), 148 Ind. App. 297, 265 N. E. 2d 419.

40. It will be noted that none of the findings as to paternity, support allowance, custody, or visitation are formally made a part of the decree or judgment.

sons), he had accepted its benefits. *In re Anderson's Estate* (Mont. 1948), 194 P. 2d 621, in which the children of a deceased second husband who had financed and counseled a Nevada divorce by the woman he later married were estopped to question the validity of that divorce to defeat her claim to a widow's share of his estate. Neither case is in point.

Even though we might be persuaded to agree that by marrying a person known to have been previously married and now purportedly divorced, one is estopped to question the marital status decreed by the purported divorce (which we do not concede), we cannot accept the thesis that he also estops himself to question the paternity implications of a support and custody order made incidental to the divorce decree. Such an order does not affect the child's status, especially when the child is not a party to the action. In fact, the want of any binding effect on the child's status seems to be the basic reason for the widespread practice of *not* appointing a guardian *ad litem* for him, or otherwise providing for his representation in divorce cases and paternity-support cases.[41] The finding that the child "was born as the issue of this marriage" amounts to no more than a finding that he was born to the wife during the marriage, a fact not in dispute in the instant case, nor in the divorce case, so far as the record here reveals.

It would seem to be basic, and beyond challenge, that anything decided in the case at bar is in no way binding on the

41. "In an annotation in 65 A. L. R. 2d at page 1393, it is said:
"'But the widespread practice in other jurisdictions is to litigate the question of paternity without the appointment of a guardian ad litem. One reason for this practice is that, in so far as support for the child is concerned, it is paid to the wife, and she ordinarily has such an interest in the question as to ensure that it will be adequately presented to the court. Again, if the child is not a party to the action he is not bound by the adjudication concerning paternity, so that there is little point in appointing a guardian ad litem for him.'
"The rule that the child is not bound by a finding of nonpaternity in a divorce case is supported by the weight of authority. *Shatford* v. *Shatford*, 214 Ark. 612, 217 S. W. 2d 917; *Daniels* v. *Daniels*, 143 Cal. App. 2d 430, 300 P. 2d 355; *Conzales* v. *Pacific Greyhound Lines*, 34 Cal. 2d 749, 214 P. 2d 809." *State* v. *Cornett* (Okla.) (1964), 391 P. 2d 277, 282.

child or on his personal representative or his heirs after his death. That is so for the simple reason that he is not a party to this action. The child is not a chattel the title to which is in dispute between rival claimants. Each of the two rivals (who are the only parties to this action) lays claim to an exclusive interpersonal relationship between himself and a third person (the child). The law now presumes the existence of that relationship between the third person (the child), and the defendant. The otherwise of that coin, practically speaking at least, is the presumption that the relationship of father and son does not exist between plaintiff and the child. That presumption can be overcome and the relationship can be judicially established only in an action to which the child is a party.

It would avail plaintiff nothing to establish facts relating to paternity in a judgment binding only on himself and the defendant. Such a determination would not make him the child's heir apparent, nor, so long as Indiana continues to adhere to the mutuality requirement in its doctrine of *res judicata,* could the child avail himself of such a judgment to make the child the plaintiff's heir.[42]

Prior to the effective date of our current rules of procedure (January 1, 1970) the trial court would probably have been within the bounds of reasonable discretion to have dismissed this action, or to have refused to decide the controversy under the provisions of section six of the Uniform Declaratory Judgments Act (Ind. Ann. Stat. § 3-1106 [Burns 1968],

---

42. "[O]ur Supreme Court has stated the general requirement that the plea of res judicata is available only when there is privity and mutuality of estoppel. Under this requirement only parties or their privies to the former judgment could take advantage of or be bound by the former judgment." *Mayhew* v. *Deister* (1969), 144 Ind. App. 111, 244 N. E. 2d 448, 454, 16 Ind. Dec. 516, 524.

If there be instances in which a child's interest is represented by a parent so that the judgment binds the child even though he is not a party, this case lacks the identity of interest between the child and either party necessary to make either the child's representative.

IC 1971, 34-4-10-6), because, absent the child and mother[43] as parties, his decision would not terminate the controversy.[44] Now, and at the time judgment was rendered below, Trial Rule 19(A) provides in part:

> "A person who is subject to service of process shall be joined as a party in the action if
> (1) in his absence complete relief cannot be accorded among those already parties. . . . If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant."

Trial Rule 21 also provides, in part:

> "Effect of misjoinder and nonjoinder. Misjoinder of parties is not ground for dismissal of an action. Except as otherwise provided in these rules, failure to name another person as a party or include him in the action is not ground for dismissal; but such omission is subject to the right of such person to intervene or of an opposing party to name or include him in the action as permitted by these rules. Subject to its sound discretion and on motion of any party or *of its own initiative, the court may order parties* dropped or *added* at any stage of the action and on such terms as are just and will avoid delay. . . ." (Emphasis added.)

Trial Rule 57 provides, in part:

> "The procedure for obtaining a declaratory judgment shall be in accordance with these rules. . . ."

Since the absent persons reside in plaintiff's household, the trial court should experience no problem of feasibility in their joinder. A more likely practical difficulty may arise in providing adequate and effective representation of the child's interest. But the resourcefulness of Indiana's trial judges gives assurance that any such problem which may arise will be short-lived.

---

43. We assume little needs to be said of her interest beyond noting her obvious financial interest in support liability.

44. *G. S. Suppiger Co.* v. *Summit Gas & Water Co.* (1949), 119 Ind. App. 102, 109, 84 N. E. 2d 207.

Both plaintiff and defendant filed motions for summary judgment. Plaintiff's motion was supported by the affidavit of a physician to the effect that a blood grouping test to which the parties, the mother, and the child submitted established that defendant cannot be the father and that plaintiff could be. Also, by the mother's affidavit that plaintiff is the only man with whom she had sexual intercourse during the time the child was conceived and that during her marriage to defendant he was impotent.

Defendant's only response to plaintiff's motion was to file his own motion for summary judgment, apparently relying primarily on the presumptions in his favor and on public policy arguments. He submitted no affidavit controverting the doctor's affidavit as to the blood test results but did argumentatively question the sufficiency of the affidavit as conclusive proof of his non-paternity. He also submitted his own affidavit denying impotency and asserting that he "regularly had sexual relations with the . . . [mother, his wife] during their marriage." Plaintiff contends this is not a statement that he had sexual intercourse with the mother during the time of conception and therefore her sworn statement that plaintiff was the only man with whom she had intercourse during that time stands as an undisputed fact. We hold, however, that in the context of summary judgment procedure, her sworn assertion is disputed by defendant's affidavit and by the certified copy of the divorce entry which defendant also submitted with his motion.

Nor do we believe the doctor's sworn report states merely facts, rather than conclusions. We hold that its submission by the plaintiff does not create a situation in which failure to file a sworn denial of its conclusion that defendant is excluded as the father establishes it as an undisputed fact. We have said there are some issues, such as negligence, or standards of care and conduct, which seldom should be resolved by summary judgment. Further, that "[i]f there is a question as to . . . credibility of witnesses or weight of testimony, sum-

mary judgment should be denied." Also, that " '[i]n deciding whether there is an issue of material facts in a case, all doubts must be resolved against the party asking for summary judgment." *Wozniczka* v. *McKean* (1969), 144 Ind. App. 471, 496, 498, 499, 247 N. E. 2d 215, 228, 229, 230, 17 Ind. Dec. 401.

The case of *Houghton* v. *Houghton* (1965), 179 Neb. 275, 137 N. W. 2d 861, was a 4-3 decision that blood test results indicating nonpaternity of the husband in a divorce case in which a child's paternity was at issue should have been treated by the trial judge as conclusive. The results were presented, however, by the live testimony of the physician in charge of the tests. He was questioned at great length on both direct and cross-examination and testified in great detail as to all matters connected with the test, the experience and training of the personnel involved, the procedures followed, and the duplications designed to detect human error, etc. What was decided was not that every physician's affidavit of the results of blood grouping tests must be accepted as conclusive. What was held is that "the qualifications of his [the doctor's] technicians to make the tests have been adequately shown as have his to interpret them." The four judges concluded that "there is nothing in the record which would indicate any defect in the testing methods, and his testimony and conclusions remain unshaken."[45]

We believe that every party against whom is used a conclusion of nonpaternity arising from blood grouping tests should have the right to insist that the party seeking to use the blood testator's conclusion must first establish the accuracy of the test. We are also inclined to the view that just as there are public policy considerations which prevent the granting of divorces on summary judgment there is a similar consideration which prevents establishing pa-

---

45. 137 N. W. 2d at 868. We could never have reached that result in Indiana, since it very obviously involved a weighing of the evidence by the appellate tribunal. *Doi* v. *Huber* (1969), 144 Ind. App. 451, 457, 247 N. E. 2d 103, 107, 17 Ind. Dec. 367, 372.

ternity · or nonpaternity on summary judgment, especially when the judgment would have the effect of rendering a previously legitimate child illegitimate.[46] The dissenting opinion in *Houghton* v. *Houghton, supra,* recognized that consideration when it said of blood test evidence:

"We all recognize the advances made in medical science. The procedures and tests performed as a result of the advances in the medical field are entitled to every consideration. The courts recognize and accept the new procedures. Yet the duty of preserving the home and protecting children born during the marriage relationship from the stigma of illegitimacy is one of the most important responsibilities of society and the courts. To meet this responsibility the courts have adopted the rule relating to the presumption of legitimacy. These rules must not be changed or modified by new medical procedures and tests unless such tests are shown to have been accurately made; or unless the Legislature has enacted appropriate statutes relative to such tests."

The judgment is reversed and the cause remanded with directions to overrule both motions for summary judgment; to make appropriate orders for the joinder of the child and mother as parties and for the proper representation of the child's interests; and to proceed to a final disposition in a manner not inconsistent with the views herein expressed.

Reversed and remanded.

Hoffman, C. J., Sharp. and Staton, JJ., concur.

NOTE.—Reported in 277 N. E. 2d 599.

NOTE BY THE COURT: The trial court transferred this case to the juvenile docket. We commend the trial judge thus invoking the provisions of section 15 of the juvenile court act[47] for the protection of the child from the harmful consequences which may result from unnecessary notoriety that his social status of legitimacy is being questioned. To

46. *Rea* v. *Rea* (D. C. D. C. 1954), 124 F. Supp. 922. See also *Von Behren* v. *Von Behren* (1969), 252 Ind. 542, 548, 251 N. E. 2d 35 holding summary judgment to be inappropriate *habeas corpus* involving child custody.

47. Ind. Ann. Stat. § 9-3215 (Burns 1971), IC 1971, 31-5-7-15.

the extent possible the same protection should also be extended to him on the appellate level. We therefore direct that the clerk of this court withhold from public examination the record (transcript), briefs, and other papers in this case. Copies of this opinion should be mailed to court and counsel in the usual manner but all copies made available to the press and public should bear ficticious names for the parties, such as A———. B———., plaintiff-appellant, vs. C———. D———., defendant-appellee, and should carry no number. The official reporter of the court, all unofficial reporters, all news media representatives, counsel, and the parties are requested to co-operate in preserving the anonymity of the child by not using the true names of the parties in any report of this case, written or oral.